## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

ROBERT C. MARSHALL,                     )
                                        )
            Plaintiff,                  )        No. 18-549
                                        )
        v.                              )        Filed: March 1, 2023
                                        )
THE UNITED STATES,                      )
                                        )
            Defendant.                  )
_____        )

## OPINION AND ORDER

Plaintiff Robert C. Marshall is a retired Lieutenant Colonel in the United States Marine Corps Reserve ("USMC"). He brings this action to challenge his separation from active duty both in 2012 and 2016–2017. As a result of a prior remand, the Board for the Correction of Naval Records ("BCNR") found Plaintiff's 2012 separation unlawful because the Marine Corps failed to conduct the required separation physical examination and pre-separation counseling. Nonetheless, Plaintiff contends the BCNR's decision did not provide full and fitting relief, and he seeks additional constructive service credit as well as out-of-pocket medical expenses. The 2016–2017 separation claim is before the Court in the first instance. That claim alleges that when Plaintiff refused to execute a waiver of the sanctuary protection provided in 10 U.S.C. § 12686 the Marine Corps unlawfully withheld further active duty orders to facilitate Plaintiff's ongoing medical treatment. Plaintiff alleges that the Marine Corps had a statutory and regulatory obligation to retain him on duty and lacked authority to condition his active duty orders on a sanctuary waiver.

Before the Court are Defendant's Motion for Judgment on the Administrative Record and Plaintiff's Cross-Motion for Judgment on the Administrative Record. For the reasons stated

below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion.

## BACKGROUND

I.      **Statutory and Regulatory Framework**

A.      **Active Duty Authorities**

Section 12301 of Title 10 defines the authority of the Secretary concerned (here, the Secretary of the Navy ("Secretary")) to order reserve component members to active duty.   As relevant here, § 12301(d) provides that, "[a]t any time, an authority designated by the Secretary concerned may order [a reservist] under his jurisdiction to active duty, or retain him on active duty, with the consent of that member."   10 U.S.C. § 12301(d).   Section 12301(h) permits the Secretary of a military department, when authorized by the Secretary of Defense, to order a reservist to active duty or retain a reservist on active duty for purposes of authorized medical care or disability evaluation "with the consent of the member."   *Id.* § 12301(h)(1); *see id.* § 12301(h)(2).

This authority is implemented by Department of Defense Instruction ("DoDI") 1241.01 and DoDI 1332.18, which both mandate the retention of certain reservists, with their consent, on active duty for the purpose of completing medical care or the disability evaluation process. Specifically, DoDI 1241.01 provides:

> 3. <u>POLICY</u>. It is [Department of Defense ("DoD")] policy that: . . .
>
> (2) When an RC [Reserve Component] Service member is on active duty (AD) . . . for a period of more than 30 days and, at the scheduled end of that period, has an unresolved in-LOD [Line of Duty] condition that may render the member unfit for duty under the Disability Evaluation System (DES), but this has not yet been determined by the DES, the member:
>> (a) *Will*, with his or her consent, be retained on AD . . . until:
>>> 1. Outstanding in-LOD conditions are resolved; or
>>> 2. He or she is either found fit for duty, separated, or retired as a result of a DES finding.

2

Reserve Component (RC) Line of Duty Determination for Medical and Dental Treatments and Incapacitation Pay Entitlements, DoDI 1241.01, ¶ 3 (April 19, 2016) (emphasis added). The instruction recognizes that a reservist "[m]ay elect to be released from active duty before resolution of the conditions or completion of the DES process." *Id.* ¶ 3.a(2)(b). DoDI 1332.18 employs almost identical language, stating DoD's policy that "RC Service members on active duty orders specifying a period of more than 30 days will, with their consent, be kept on active duty for disability evaluation processing until final disposition by the Secretary of the Military Department concerned." Disability Evaluation System (DES), DoDI 1332.18, ¶ 3.h (Aug. 5, 2014). The instruction likewise provides a reservist with the ability to choose to leave active duty before completion of DES processing. *Id.*

The Navy and the USMC have issued additional policy instructions relevant to the retention of reservists who are receiving medical care or are in the DES process. Secretary of the Navy Instruction ("SECNAVINST") 1770.3D substantially mirrors the language of DoDI 1241.01 and DoDI 1332.18 but is phrased permissively rather than as mandatory policy. *See* Management and Disposition of Incapacitation and Incapacitation Benefits for Members of Navy and Marine Corps Reserve Components, SECNAVINST 1770.3D, ¶ 3 (Mar. 17, 2006) ("[M]embers, with their consent, *may* also be ordered to, or continued on, active duty to complete authorized medical care, be medically evaluated for disability or to complete a required [DoD] healthcare study . . . ." (emphasis added)). The instruction defines Medical Hold status as the "[r]etention of reservists on active duty to receive medical treatment for service-connected injuries, illnesses and/or diseases until determined Fit for Duty by the BIA [Benefits Issuing Authority] Senior Medical Officer (SMO) and/or Medical Status Review Officer (MSRO), or until final disposition is determined by

the PEB [Physical Evaluation Board]."[1]  *Id.* ¶ 6.m.  It further sets forth the Medical Hold process, which begins with a determination by the BIA that a reservist should be placed in the Medical Hold program subject to the reservist's eligibility and the reservist's "[c]onsent to remain or be placed on active duty for incapacitation or [DES] adjudication."  *Id.* ¶ 8.b(2).  For reservists "who decline to accept or continue on active duty" under Medical Hold, SECNAVINST 1770.3D directs the BIA to complete a "Release from Active Duty Against Medical Advice" form.  *Id.* ¶ 8.h.

At the USMC level, Marine Administrative Message ("MARADMIN") 259/04, like DoDI 1241.01 and DoDI 1332.18, mandates the retention of certain injured reservists on active duty. *See* Policy Guidance for Activated Reservists (IRR/IMA/SMCR) and Retirees Who Have Incurred or Aggravated Medical Conditions While on Active Duty, MARADMIN 259/04, ¶ 3.D (June 15, 2004) ("Marines activated for a period of more than 30 days [who become sick, injured, or aggravate an existing medical condition] . . . *will* be retained on active duty until they are fit for duty, or had their medical status reviewed by the SMO . . . and/or processed through the DES . . . ." (emphasis added)).  Although not explicitly referencing the consent requirement, the policy guidance acknowledges the choice of a reservist to be (or not to be) placed on Medical Hold.  *Id.* ¶ 5.  It further defines Medical Hold as a "convenience of the government" and "temporary status in which a Marine is placed when required to remain on active duty beyond the Marine[']s EAS/ECC [end of active service/expiration of current contract] to complete medical treatment, or prepare for a MEB or [PEB]."  *Id.* ¶ 2.C.

---

[1] "Fit for Duty" is a "pronouncement by a Military physician or by a Medical Evaluation Board that a service member previously on light or limited duty has healed from the injury, illness, or disease that necessitated the member's serving in a medically restricted duty status." SECNAVINST 1770.3D, ¶ 6.e.  "Fit for Continued Naval Service" is a "finding made exclusively by the Department of the Navy's PEB indicating that the service member is reasonably able to perform the duties of his or her office, grade, rank or rating."  *Id.* ¶ 6.f.

**B.      Sanctuary Authorities**

Section 12686 of Title 10 prohibits—except by approval of the Secretary concerned—the involuntary release of reservists, who are on active duty under non-training orders and within two years of eligibility for retired pay, prior to those reservists becoming eligible for that pay.   10 U.S.C. § 12686(a).  This two-year period after a reservist accumulates 18 years of active duty time is commonly referred to as "sanctuary."  *See* Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, SECNAVINST 1800.2, ¶ 2 (June 22, 2008).  Sanctuary protection is not guaranteed.  The statute provides the Secretary concerned with authority to require sanctuary-eligible reservists, as a condition of certain active duty orders, to waive the applicability of § 12686(a) for the period of active duty specified in those orders.   10 U.S.C. § 12686(b).  The application of this authority is expressly limited to "a member of a reserve component who is to be ordered to active duty (other than for training) under section 12301 of this title pursuant to an order to active duty that specifies a period of less than 180 days and who (but for this subsection) would be covered by subsection (a)."  *Id.*  The statute provides the service branch Secretary not only with discretion to decide whether to require waiver at all but also to determine the timing of the execution of any waiver.  The Secretary "may require that a waiver . . . be executed before the period of active duty begins."  *Id.*

The Navy and the USMC have issued numerous policies and other guidance documents related to sanctuary waiver, including order-issuance and approval processes designed to ensure that reservists "who meet or exceed 18 years of active duty do so by design and are planned, budgeted additions to the Total Force."   SECNAVINST 1800.2, ¶ 3; *see* Policy and Procedures for Reserve Component Sailors Service Beyond 16 Years of Active-Duty Service, Office of the Chief of Naval Operations Instruction ("OPNAVINST") 1001.27, ¶ 1 (Jan. 9, 2013) (ensuring "all

entry into sanctuary or earning of a regular retirement is the result of planned actions necessary to meet the needs of the Navy").  As affirmed by the Secretary, "[t]he Marine Corps process, sanctuary considerations and manpower assignments" are set forth in Marine Corps instructions, such as Marine Corps Order ("MCO") 1800.11.  SECNAVINST 1800.2, ¶ 3.d.  That order provides for the management of Marine reservists who are beyond 16 years of active duty service or within two years of becoming eligible to enter sanctuary and designates the Deputy Commandant Manpower & Reserve Affairs ("DC M&RA") as "the sole approval authority for all [Marine reservists] to . . . exceed 18 active duty years and enter into AD [active duty] sanctuary."  Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, MCO 1800.11, ch. 1, ¶ 3.b (Oct. 27, 2009).  It provides that any active duty order for a Marine reservist that has an end of active service date that would accumulate 18 or more years of active duty time for the reservist must be approved by the DC M&RA and that such order "shall not be issued to any [reservist] without a sanctuary request approved in accordance with this order."  *Id.* ¶ 4.k.1.  The order allows for reservists to request active duty orders that would result in serving 18 years or more on active duty but only "contingent upon executing a waiver of sanctuary protection."  *Id.* ¶ 12.  Pursuant to § 12686(b), it mandates that "[o]rders requiring waiver of sanctuary protection must be for 179 days or less and pursuant to authority of 10 U.S.C. 12301," *id.* ¶ 12.a, and that any waiver must be provided in writing "prior to executing the orders providing for 18 or more total active duty years."  *Id.* ¶ 12.b; *see* Waiver of Sanctuary Protection, MARADMIN 104/13, ¶ 4.C (Feb. 28, 2013) (requiring that all active duty orders that would result in a reservist reaching 18 years of active duty service "be accompanied with a waiver of sanctuary protection" and "shall not exceed 179 days in length").

MCO 1001.61A provides policy guidance on the application of sanctuary waiver to reservists on Medical Hold.  *See* Policy and Procedures for Sourcing Personnel to Meet Individual Augmentation (IA) Requirements, MCO 1001.61A, ch. 3, ¶ 7 (Feb. 22, 2013).  According to that order, if a reservist's "initial placement or subsequent extension" on Medical Hold will cause him or her to exceed 18 years of active duty service, then the DC M&RA "can withhold the issuance of [active duty] orders if the reservist fails to execute a waiver of sanctuary eligibility as part of their consent to be continued on active duty for medical observation, evaluation or treatment."  *Id.*  The policy requires that a separate request be executed for each 179-day order, which if approved "would be back-to-back, and not extending the original set."  *Id.*, ch. 2, ¶ 5.c.

## II.     Findings of Fact

Plaintiff retired from the Reserve as a Lieutenant Colonel in 2019, with over 19 years of active duty service.  Admin. R. ("AR") 1343–48, ECF No. 44.[2]  He began his military career as a commissioned officer in the Marine Corps on July 12, 1991, and served on active duty as a regular component officer until 2003.  AR 20, 1360.[3]  During this period of duty, Plaintiff graduated with a Juris Doctorate from Cornell Law School.  AR 1489–93.  In 2003, Plaintiff left active duty and accepted a commission with the Reserve.  AR 20, 1330, 1333.  While in the Reserve, Plaintiff was mobilized to active duty on numerous occasions.  Two of these active duty periods are relevant to the claims in this action.

---

[2] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

[3] The Administrative Record does not include a copy of all of Plaintiff's orders, sanctuary waiver requests, and other underlying records pertinent to his claims.  In some instances, the Court has made factual findings based on undisputed facts drawn from the "Chronology of Relevant Events" prepared during the BCNR remands.

A.      **Active Duty in 2011–2012**

In 2010, Plaintiff received mobilization orders to active duty in Afghanistan to support Operation Enduring Freedom.  AR 20, 1560–69.  From January through early February 2011, he attended pre-deployment training at Camp Lejeune in North Carolina.  AR 20.  During a training exercise at Camp Lejeune, Plaintiff suffered an injury to the cervical spine which triggered persistent pain in his right arm and hand.  AR 20, 100, 323–25.  Despite his injury, on February 22, 2011, Plaintiff deployed to Afghanistan where he served as Officer in Charge of Governance.  AR 20, 477, 1560–69.  Plaintiff returned to Camp Lejeune on February 22, 2012.  AR 20, 477.  Upon his return from Afghanistan, Plaintiff completed a Physical Health Assessment.  AR 20, 103–16.  The assessment noted that Plaintiff suffered a neck injury during pre-deployment training and was still experiencing neck pain at the time.  AR 20, 114.  Nonetheless, it determined Plaintiff was "fully medically ready and require[d] no follow-up care."  AR 116.  Plaintiff was separated from active duty on April 27, 2012, without receiving a separation physical examination or pre-separation counseling.  AR 21.

Plaintiff returned to active duty from April 29 through May 25, 2012, to attend Civil Affairs School in Quantico, Virginia.  AR 21, 135.  In June 2012, after he was released from duty, Plaintiff began to experience elevated levels of severe pain in his neck and right arm.  AR 21, 140.  On August 6, 2012, Plaintiff underwent spinal fusion surgery to address his injury.  *Id.*  After notifying his command of his medical issues, the USMC placed Plaintiff on temporary limited duty from August 16 through November 6, 2012.[4]  AR 21, 282.  On November 6, 2012, Plaintiff was cleared as fit for duty and removed from temporary limited duty status.  AR 21.

---

[4] Temporary limited duty is a period of duty where a servicemember performs limited military duties and receives medical care.  It is not a period of active duty.  Navy Manual of the Medical Department, ch. 18–2, ¶ 5 (Jan. 10, 2005).

Case 1:18-cv-00549-KCD   Document 62   Filed 03/01/23   Page 9 of 43

**B.**     **Active Duty in 2015–2017**

On January 2, 2013, Plaintiff began active duty orders to serve as a disability evaluation attorney with the Wounded Warrior Battalion at Camp Pendleton in California. AR 22, 1245–46, 1581–87. Plaintiff alleges these orders were extended multiple times, until he began approaching 18 years of active duty service. AR 1171–72. At the direction of Headquarters Marine Corps ("HQMC"), Plaintiff submitted a sanctuary waiver request on August 1, 2015, for a period covering 179 days—from September 26, 2015, through March 23, 2016—to continue serving on active duty past 18 years. AR 22, 1172. On September 26, 2015, Plaintiff was separated from active duty. AR 22. On October 5, 2015, Plaintiff received new active duty orders to return to the Wounded Warrior Battalion at Camp Pendleton as a disability evaluation attorney. AR 1216–22. The orders specified a period from October 7, 2015, through March 23, 2016, a total of 169 days. AR 1216. The orders made no mention of Plaintiff's request to waive sanctuary and expressly stated that Plaintiff "may become eligible for sanctuary zone protection." AR 1222.

On March 16, 2016, shortly before his orders were set to end, Plaintiff advised the Deployment Processing Center that he was suffering increasing pain in his left shoulder that required follow-up care. AR 22, 599–610. According to his medical notes, Plaintiff "had a long complex history involving his left shoulder," including numerous dislocations, which led to surgical repair in 1992. AR 615. To facilitate further medical treatment for Plaintiff, on March 21, 2016, the Marine Corps' BIA issued Plaintiff a Medical Hold authorization for March 24 through June 24, 2016. AR 1228–29. However, because Plaintiff had over 18 years of active duty service, HQMC refused to extend his orders due to sanctuary issues. AR 23, 908. On March 23, 2016, the final day of his then-current orders, HQMC asked Plaintiff if he intended to execute a sanctuary waiver request in order to receive an extension of his orders for Medical Hold. AR 23,

909, 1233–36.  At the time, Plaintiff was already traveling to his home of record.  AR 23, 909, 1233.   As no waiver had been signed, the USMC separated Plaintiff from active duty notwithstanding his Medical Hold authorization.  AR 909.

On April 26, 2016, after further discussions with HQMC, Plaintiff submitted a sanctuary waiver request covering a period of May 1 through September 30, 2016.  AR 1237–43, 1248. While still separated from active duty, he underwent surgery for his shoulder injury in early May 2016. AR 623–26.  In early June 2016, following his surgery, the BIA extended Plaintiff's Medical Hold authorization to September 24, 2016.  AR 23.  HQMC then issued Plaintiff active duty orders for the purpose of Medical Hold for the period of June 14 through September 24, 2016, a total of 103 days.  AR 23, 1255–60.  Like the October 2015 orders, the June 2016 orders made no mention of Plaintiff's sanctuary waiver and stated that he "may become eligible for sanctuary zone protection."  AR 23, 1260.

In August 2016, HQMC informed Plaintiff that his April 2016 sanctuary waiver would expire soon and that he needed to submit new sanctuary waiver requests to remain on orders for Medical Hold.  AR 23, 1183.  Plaintiff filed two such requests, dated August 22 and 26, 2016, respectively, to waive sanctuary for the period of September 24, 2016, through March 22, 2017. AR 23, 1184.  The BIA subsequently extended Plaintiff's Medical Hold authorization to May 17, 2017, AR 1268–69, and HQMC issued Plaintiff two additional active duty orders.  AR 24.  The first order extended his active duty period (which began June 14, 2016) through December 9, 2016, for a total period of 179 days.  AR 1187, 1276.  The second order, which was a "back-to-back" order, created a new active duty period from December 10, 2016, through March 22, 2017, a total of 103 days.  AR 24, 1276–81.  Petitioner was told that, even though Medical Hold was authorized through mid-May, HQMC would extend his order only to March 22, 2017, because the period

covered by his sanctuary waiver request ended on that date.  AR 23–24.  Plaintiff objected to the back-to-back order, calling the break in orders a "transparent attempt to create a legal fiction" to avoid Plaintiff obtaining statutory sanctuary rights.  AR 1274.

Just as it did in the past, as the end date of Plaintiff's order approached, HQMC advised him that it would not issue further active duty orders for Medical Hold past March 22, 2017, unless and until he submitted a request for a sanctuary waiver covering that period.  AR 24.  On March 6, 2017, Plaintiff filed a complaint with the Office of the Naval Inspector General, contending that conditioning Medical Hold orders on requests for sanctuary waivers is unlawful.  AR 1286–88.  Plaintiff ultimately refused to submit an additional sanctuary waiver request and was separated from active duty on March 22, 2017.  AR 1190, 1314.  The USMC did not provide Plaintiff with a separation physical examination or pre-separation counseling and did not determine whether Plaintiff was fit for duty.  AR 24, 1190.

## III.   Procedural History

On April 16, 2018, Plaintiff filed a Complaint alleging that his separation from active duty on April 27, 2012, was contrary to statute and military regulations.  *See* Pl.'s Compl. ¶ 1, ECF No. 1.  Specifically, he alleged that the USMC failed to make a "line of duty" determination following his pre-deployment training accident to determine Plaintiff's eligibility for benefits and then unlawfully separated him after his deployment without a separation physical examination and pre-separation counseling as required by 10 U.S.C. §§ 1142 and 1145.  *Id.* ¶¶ 1, 3, 93–98.  He further alleged that the USMC was required to continue him on active duty for Medical Hold because of the unresolved neck injury he suffered in the line of duty.  *Id.* ¶¶ 2, 116–19.  Plaintiff sought a correction of records to reflect that he remained in an active duty status until December 6, 2012 (30 days after he was found fit for duty) to account for out-processing time, travel to his home of

record, and use of terminal leave.  *Id.* ¶ 132, pt. 1(B).  He also requested all back pay, allowances, and benefits to which he otherwise would have been entitled and out-of-pocket medical expenses that he would not have incurred but for his unlawful separation.  *Id.* ¶ 132, pt. 1(C)–(D).  On October 18, 2018, the Court granted Defendant's request to remand Plaintiff's claims to the Navy so that the BCNR could consider his requests in the first instance.  *See* Order Granting Remand, ECF No. 10.

The BCNR issued a decision on remand on November 12, 2019, granting Plaintiff partial relief.  AR 42.  The BCNR determined that Plaintiff incurred his neck injury in the line of duty and that the USMC violated the law by failing to provide Plaintiff with a separation physical examination and pre-separation counseling before releasing him from active duty in April 2012.  AR 40.  It also concluded that had such procedures been followed it likely would have resulted in Plaintiff being placed in a Medical Hold status due to his neck injury.  *Id.*  The BCNR recommended that Plaintiff's records be corrected to reflect that he was in an active duty for Medical Hold status from April 28, 2012 (the date following his release from active duty) through November 6, 2012 (the date on which Plaintiff was determined fit for duty).  AR 41.  The BCNR also recommended that Plaintiff receive back pay and active duty service credit for April 28, 2012, and the period of May 26 through November 9, 2012.  *Id.*  It concluded Plaintiff was not entitled to back pay and service credit for the period of April 29 through May 25, 2012, because Plaintiff was on active duty at Civil Affairs School during that time and should not receive double pay or credit for that period.  *Id.*  It further concluded that Plaintiff was not entitled to back pay or active duty service credit through December 6, 2012, as he requested, and that Plaintiff should not be compensated for out-of-pocket expenses without first seeking relief through the administrative claims process of TRICARE, a military health care program.  *Id.*

On February 17, 2020, Plaintiff filed his First Amended Complaint, alleging in Part A that the BCNR erred in denying him the full relief he requested with respect to his active duty period in 2011–2012. *See* Pl.'s First Am. Compl. ¶ 1, ECF No. 23. Specifically, he sought an award of back pay and service credit from November 7 to December 6, 2012, reimbursement of out-of-pocket medical expenses, and a family separation allowance for the period of time he was attending Civil Affairs School (April 29 through May 25, 2012). *Id.* ¶¶ 295(1)–(2). In Part B, Plaintiff made a host of new allegations regarding his periods of active duty in 2015–2017. Specifically, Plaintiff alleged that: (1) the USMC's conditioning of his Medical Hold orders on the execution of sanctuary waivers was unlawful; (2) the Secretary did not delegate authority to HQMC to require Plaintiff's sanctuary waivers; (3) Plaintiff's blanket sanctuary waivers and continuous orders exceeding 179 days were contrary to law and procedure; (4) the law permitted the Secretary to require a sanctuary waiver only when a reservist is initially ordered to active duty, not when subsequent orders retain or continue him or her on active duty; (5) HQMC did not properly approve Plaintiff's requests for sanctuary waivers in accordance with procedure; (6) Plaintiff was entitled to sanctuary zone protection based on travel to his home of record on March 24, 2016; and (7) the USMC failed to provide Plaintiff with a separation physical examination and pre-separation counseling and discharged him with an unresolved medical issue contrary to law and procedure. *Id.* ¶¶ 249, 255, 260–61, 269, 272–79, 284–85, 287–92. He requested a correction of his military records reflecting that he continued on active duty beyond March 23, 2016, until he was found fit for duty or completed the disability evaluation process or, in the alternative, until he reached 20 years of active duty service, as well as all associated back pay, allowances, and benefits to which he otherwise would have been entitled. *Id.* ¶¶ 295(3)(a)–(b).

13

On March 10, 2021, pursuant to the parties' agreement, the Court remanded Plaintiff's claims, both in Parts A and B, to the BCNR.  *See* Order Staying Case, ECF No. 35.  On August 9, 2021, the BCNR issued a remand decision.  AR 1.  As to Part A, the Board denied Plaintiff any further relief beyond what it determined to be appropriate in its November 2019 decision.  AR 3– 4.  Specifically, it rejected Plaintiff's claim for entitlement to a constructive service credit through December 6, 2012, finding it would be a "windfall" and noting that in the real world Plaintiff was demobilized on the date he was found fit for duty.  AR 4.  The Board reiterated that it did not have authority to grant Plaintiff's request for out-of-pocket expenses and for a family separation allowance, as any amounts owing must be determined by TRICARE and the Defense Finance and Accounting Service ("DFAS"), respectively.  AR 4–5.

As to Part B claims, the Board found no error or injustice in the USMC's conditioning Plaintiff's active duty orders for purposes of Medical Hold on the execution of sanctuary waivers, or in separating Plaintiff—notwithstanding his unresolved medical issue—due to his refusal to waive sanctuary.  AR 8–11, 13–14.  It also rejected all but one of Plaintiff's remaining claims. Specifically, it found that HQMC possessed the proper delegated authority to require Plaintiff to execute sanctuary waivers.  AR 11.  It found no error in the practice of using blanket waivers or back-to-back orders, which each specified a period of 179 days and otherwise conformed to the law.  AR 12.  It likewise rejected the notion that waivers may be required only for initial orders to active duty, as opposed to orders extending active duty, citing MCO 1001.61A's express waiver requirement for reservists on Medical Hold.  *Id.*  The Board also found that any procedural failures in the notification and approval process for Plaintiff's sanctuary waivers did not render them invalid, as the fact that HQMC issued the orders implies that it approved the waivers.  AR 12–13.

14

However, it agreed that the USMC unlawfully failed to provide Plaintiff with a separation physical examination and pre-separation counseling.  AR 13.  It nonetheless found that error harmless.  *Id.*

On September 14, 2021, Plaintiff filed a Second Amended Complaint, challenging the BCNR's August 2021 decision.  *See* Pl.'s Second Am. Compl., ECF No. 42.  Defendant filed a Motion for Judgment on the Administrative Record on December 6, 2021, requesting that the Court uphold the BCNR's August 2021 decision.  *See* ECF No. 45.  On February 9, 2022, Plaintiff filed an Opposition and Cross-Motion for Judgment on the Administrative Record, asserting that the BCNR's decision should be set aside as both arbitrary and capricious and contrary to law based on the same or similar arguments raised before the BCNR.  *See* ECF No. 48.  The parties' cross-motions are now fully briefed.  *See* Def.'s Opp'n & Reply, ECF No. 51; Pl.'s Reply, ECF No. 53.  The Court heard oral argument on September 29, 2022.

## LEGAL STANDARDS

### I.  Rule 52.1 Motions

Motions for judgment on the administrative record are governed by Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  RCFC 52.1(c).  Such motion is "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).

Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

## II.        Standard of Review in Military Pay Cases

In military pay cases, the scope of judicial review is deferential and is limited to determining whether an action or decision by the military was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law."  *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983)); *see Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003) (noting that arbitrary-and-capricious review is applied in suits challenging underlying discharge actions as well as the decisions of military correction boards).  The Court's review is limited to the administrative record. *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).  Therefore, the record must contain evidence of legal error or deficiency in the decision-making process, meriting judicial relief and "overcom[ing] the strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith."  *Doe*, 132 F.3d at 1434 (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)).  The burden is on the plaintiff to prove such error through "cogent and clearly convincing evidence."  *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting *Dorl v. United States*, 200 Ct. Cl. 626, 633 (1973), *cert. denied*, 414 U.S. 1032 (1973)).

Beyond the presumption that military administrators lawfully discharge their duties, "[j]udicial deference must be 'at its apogee' in matters pertaining to the military and national defense."  *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)); *see Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993) ("Justiciability is a particularly apt inquiry when one seeks review of military activities.").

16

Nevertheless, not every claim arising from a military decision is beyond judicial review. *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995). Even where Congress provides unlimited discretion, the military is "bound to follow its own procedural regulations if it chooses to implement some." *Murphy*, 993 F.2d at 873 (citing *Sargisson v. United States*, 913 F.2d 918, 921 (Fed. Cir. 1990)); *see Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005); *see also Voge*, 844 F.2d at 779 ("[T]he Claims Court may review the [challenged decision] process for compliance with established procedures."). Accordingly, where procedural violations are alleged, "this [C]ourt does not improperly exercise any discretion reserved for the military" but rather determines only whether the challenged action violated applicable statutory and regulatory standards. *Adkins*, 68 F.3d at 1323.

## DISCUSSION

### I.    Plaintiff's Part A Claims

Of the three claims Plaintiff raises in Part A, only two remain in dispute. During briefing, Defendant paid Plaintiff the family separation allowance he was due, and thus that claim is moot. *See* ECF No. 51 at 11 & n.3; ECF No. 53 at 4 n.1. For the remaining Part A claims, Plaintiff has demonstrated he is entitled to relief in part on the issue of his constructive service credit but has failed to show that the BCNR erred in declining to award him a specific amount for out-of-pocket medical expenses.

### A.    The BCNR's Denial of Constructive Service Credit Beyond November 6, 2012, Was Arbitrary and Capricious.

Plaintiff's first claim challenges the length of the constructive service credit afforded by the BCNR. Plaintiff argues that a credit ending on the exact date Plaintiff was found fit for duty (November 6, 2012) does not provide full and fitting relief. ECF No. 48 at 16–17. Rather, to return him to the position he would have been in but for his unlawful separation on April 27, 2012,

he claims the BCNR should have awarded a longer credit that accounted for the time needed to out-process, travel to his home of record, and take terminal leave after receiving his fitness determination—a minimum of 30 additional days, according to Plaintiff. *Id.* at 17–18. Defendant argues that the BCNR rationally determined Plaintiff was not entitled to additional credit for out-processing and travel because, in reality, he had already out-processed and returned home by the date he was determined fit. ECF No. 45 at 23–24. It further contends that Plaintiff would not have been entitled to terminal leave in any event, and that he has since been paid for the leave he accrued during the constructive service period granted in the BCNR's August 2021 decision. *Id.* at 24–25.

The BCNR, like other correction boards, is obligated both to determine "the true nature of an alleged [error or] injustice and to take steps to grant thorough and fitting relief" to a successful applicant. *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (quoting *Caddington v. United States*, 147 Ct. Cl. 629, 634 (1959)). Where the Board determines corrective action is warranted, such action should "appropriately and fully erase [the] error or compensate [the] injustice." *Id.* A similar standard applies where a court fashions relief for a service member that it determines was wrongfully discharged. In either case, the "central principle" is to return the member to the position he or she would have occupied but for the military's unlawful action. *Holley v. United States*, 33 Fed. Cl. 454, 456 (1995) (quoting *Dilley v. Alexander*, 627 F.2d 407, 413 (D.C. Cir. 1980)).

By denying Plaintiff any constructive service credit past November 6, 2012, the BCNR did not place Plaintiff in the position he would have been in had the Marine Corps conducted the required separation examination and counseling, which likely would have resulted in him continuing on active duty for Medical Hold until his neck injury resolved. Indeed, the BCNR conceded that "Marines do not typically leave active duty on the same day that they are found [fit

18

for duty]."  AR 3.  But rather than attempting to determine, as best as possible, when Plaintiff would have been released in the but-for world where he had been properly retained, it irrationally relied solely on the real-world facts surrounding his unlawful demobilization.  *Id.*  In determining what relief is due, comparing real-world and but-for-world circumstances is certainly a relevant inquiry.  However, the fact that Plaintiff actually out-processed (to some extent) and traveled home prior to the date he was found fit for duty does not necessarily mean he received the benefit of all or part of the relief he otherwise would have received.

The facts relied on by the BCNR do not support its conclusion.  Specifically, the Board found that Petitioner was on leave at his home of record when he was informed that he would be demobilized upon the expiration of his orders on April 27, 2012.  AR 36.  Prior to that notification, he was under the impression that his orders would be extended through June 2012 "to allow for proper demobilization."  *Id.*  Of course, that did not happen, and Plaintiff was not properly out-processed.  Had he been, Plaintiff would likely not have been discharged on April 27 and instead would have been retained on active duty to receive medical treatment in a military facility.  Assuming in those but-for circumstances that he was found fit for duty on November 6, 2012, it is reasonable to conclude (as the BCNR recognized) that the Marine Corps would have provided him with some amount of time to out-process and travel home before separating him from active duty.  Thus, in order to "fully erase" the Marine Corps' error and make Plaintiff whole, he should receive credit for that additional amount of active duty time beyond November 6.  *Roth*, 378 F.3d at 1381 (quoting *Caddington*, 147 Ct. Cl. at 632).  Otherwise, the Marine Corps will have benefited from its own unlawful conduct.

The question then is: what reasonable additional amount of active duty time would Plaintiff have received?  Plaintiff contends he likely would have remained on active duty for close to a year

had he received medical treatment at Camp Lejeune, ECF No. 48 at 17, but in an act of "great restraint" seeks only a minimum period of 30 days after his fit for duty finding, *id.* at 18. He bases this contention on an expert opinion drafted by Peter C. Faerber, who similarly was a disability evaluation system attorney stationed at Camp Pendleton. AR 1019–23. Mr. Faerber is not a medical doctor and, importantly, has his own suit against Defendant currently pending before this Court that involves remarkably similar sanctuary waiver and medical hold issues. *See Faerber v. United States*, 156 Fed. Cl. 715, 720–23 (2021). The Court views his opinion with a justifiable dose of skepticism given the inherent risk of bias.

In any event, reliable evidence in the Administrative Record demonstrates that Plaintiff likely would have been released from active duty within 10 working days of being found fit for duty. Although it appears there was no official policy in 2012, the BIA explained in an email to Plaintiff that, based on his 11-plus years of experience, "the procedure established for reserve Marines who were returned to full duty while on active duty medical hold orders was to allow them on average 10 working days to demobilize and return to their home of record." AR 1118. This procedure is also reflected in the counseling form Plaintiff signed to be placed on Medical Hold in March 2016, as well as the BIA's letter informing Plaintiff that his Medical Hold was deactivated in March 2017. AR 564 ("Members returning to full duty . . . will be released from active duty within 10 days of being found fit for full duty."); AR 1033 ("Upon my return to duty I will release from active duty within 10 working days of that finding."). Although the BIA's email also stated that his office had authorized up to 30 days for demobilization in "certain situations," he characterized those cases as involving "extenuating circumstances." AR 1118. Plaintiff's Second Amended Complaint does not allege that such circumstances exist in his case. *See* ECF No. 42 ¶¶ 53–58.

The BCNR, however, rationally rejected Plaintiff's request for additional constructive service credit to account for the hypothetical use of terminal leave. As Defendant correctly argues, terminal leave "is not an entitlement, it is a privilege." ECF No. 45 at 24 (quoting Marine Corps Separation and Retirement Manual, MCO P1900.16F, ¶ 1010(2) (June 6, 2007)). And as a matter of Marine Corps policy (at least since 2016), terminal leave is not typically granted at the conclusion of a Medical Hold. *See id.* That policy was communicated to Plaintiff in several documents relating to his 2016–2017 Medical Hold authorization. AR 564 ("Members returning to full duty will not be authorized terminal leave . . . ."); AR 515 ("Terminal leave will not be authorized at such time as a member is demobilized/discharged."); AR 1033 ("While on medical hold, I must exhaust my opportunities to take leave whenever feasible, because extensions for terminal leave will not be authorized."). Furthermore, even if terminal leave was arguably available at the conclusion of a Medical Hold, the BCNR rationally found that granting Plaintiff constructive service credit for terminal leave would unjustly award him double recovery because he already received a payout for the leave he accrued during the constructive service period awarded by the Board. AR 3–4 & n.4; *see* AR 1326 (Plaintiff's leave and earning statement showing lump sum payment of approximately $3,700 for leave sold as of November 6, 2012).

Accordingly, the BCNR's decision to end Plaintiff's constructive service period on the date he was found fit for duty was arbitrary and capricious. The Administrative Record demonstrates—and the Board conceded—that had Plaintiff been properly retained on active duty for Medical Hold he would not have been released on that date. Rather, the record demonstrates that he would have been provided up to 10 working days to demobilize. The BCNR should have corrected Plaintiff's records to reflect that additional active duty service.

**B.      The BCNR Correctly Concluded that It Does Not Have the Authority to Award Plaintiff $1,136.83 in Out-of-Pocket Medical Costs.**

Plaintiff next argues that the BCNR should have awarded him $1,136.83 in out-of-pocket medical costs related to his 2012 constructive service period, which he would not have incurred had he been on Medical Hold receiving treatment in a military facility.  ECF No. 48 at 19–21.  Defendant contends that the BCNR rationally declined to award Plaintiff the costs he requested because it had only the authority to correct Plaintiff's military records and did not have the authority to award any specific payments that may be owed due to the correction.  ECF No. 45 at 25–28; *see* AR 2, 4.  The BCNR was correct.

As a threshold matter, the role of the BCNR is "to correct any Navy record when 'necessary to correct an error or remove an injustice.'"  *Viet. Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 531 (D.C. Cir. 1988) (quoting 10 U.S.C. § 1552(a)(1)).  A decision or recommendation by the BCNR to grant corrective action, once it becomes final, provides the basis for the settlement of any monetary portion of an applicant's claims.  This may include monetary relief for "loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture," if due.  10 U.S.C. § 1552(c)(1).  However, "[c]omputation of the amounts due [must] be made by the appropriate disbursing activity" (normally DFAS), not the BCNR.  32 C.F.R. § 723.10(c)(1); *see Adams v. United States*, 126 Fed. Cl. 645, 660 (2016), *aff'd*, 696 F. App'x 511 (Fed. Cir. 2017) (holding that the Air Force Board for the Correction of Military Records' authority is limited to correction of records and that the computation of awards is the function of DFAS).  Indeed, the BCNR explained that "[e]very Board decision granting relief which may affect an applicant's benefits or compensation is automatically provided to DFAS to make such determinations."  AR 2 n.2.

Here, the BCNR afforded corrective action that provided Plaintiff a basis for recovering his out-of-pocket medical expenses. Specifically, it recommended that his military records be corrected to reflect that he was in a Medical Hold status from April 28 to November 6, 2012. AR 42. The Board therefore fulfilled its duty; and by regulation, other military components must then calculate the specific payments that flow from the Board's decision. Neither the BCNR, nor Defendant, contest that Plaintiff is entitled to some reimbursement of out-of-pocket medical expenses. The Board merely explained (and clarified to the extent it was unclear in the first remand decision) that Plaintiff should pursue payment from TRICARE or DFAS "pursuant to the record change that the Board already directed." AR 4. In that regard, Defendant represented that "DoD is in the process of determining how much of [the claimed medical expenses] LtCol Marshall is owed." ECF No. 51 at 11. Recently, Defendant updated the Court to advise that the Government issued a final decision on Plaintiff's entitlement to reimbursement and the parties are attempting to resolve any remainder of this claim without further litigation. *See* ECF No. 61.

The Federal Circuit's decision in *McCord v. United States*, 943 F.3d 1354, 1359 (Fed. Cir. 2019), on which Plaintiff relies, is inapposite. In that case, an Army servicemember sought, among other amounts, an award for out-of-pocket medical expenses that otherwise would have been covered by TRICARE had he been properly retired with medical retirement pay. *Id.* at 1356–57. The trial court held that the servicemember was not entitled to relief because he had not exhausted his administrative remedies through TRICARE before bringing his claim in court. *Id.* at 1357. The Federal Circuit Court reversed, holding that administrative exhaustion was not required because "[t]he TRICARE reimbursement procedure only covers medical claims for services authorized under the TRICARE Program, and it thus does not provide a remedy for damages

flowing from improper exclusion from the TRICARE program." *Id.* at 1359 (internal quotation omitted). Accordingly, the Court directed entry of an award of the specific expenses. *Id.* at 1360.

Unlike *McCord*, where there was no administrative remedy available, Plaintiff has not argued or shown that he cannot seek reimbursement of out-of-pocket medical expenses through the appropriate disbursing agency, whether that be TRICARE or DFAS. Moreover, *McCord* did not involve the question of whether a correction board has the authority to calculate and direct payment of specific sums owing as a result of a correction. It is therefore inapplicable to this case.[5]

Accordingly, the Court finds no error with the BCNR's conclusion that it lacked authority to grant Plaintiff a specific monetary award for reimbursement of medical expenses.

## II.    Plaintiff's Part B Claims

Plaintiff's Part B claims present a multiple-front challenge to the USMC's application of sanctuary waiver authority to active duty orders for purposes of Medical Hold. Like *Faerber*, the primary arguments involve the interplay (if any) between DoDI 1241.01 and § 12686(b), as well as whether Plaintiff's orders fell within the statutory criteria of the waiver provision. Plaintiff also argues that his waivers were void due to a lack of delegated authority and procedural violations. Finally, Plaintiff asserts an alternative basis for holding that his separation was unlawful. The Court addresses each argument in turn.

---

[5] Plaintiff also cites to *Driscoll v. United States*, which in granting judgment for the plaintiff in a military pay case remanded to the correction board with instructions to "determine the amount of backpay and other benefits or allowances that Driscoll would have received but for his wrongful discharge." 158 Fed. Cl. 399, 415 (2022); *see* ECF No. 53 at 6. On reconsideration, however, the court clarified that its instruction "did not require that the [board] perform the calculations itself or prohibit the [board] from referring the matter to DFAS to make the calculations." *Driscoll v. United States*, No. 19-1640, 2022 WL 3330432, at *3 (Fed. Cl. Aug. 11, 2022).

A.      **The BCNR Correctly Found That the USMC Had No Obligation, Absent Consent, to Continue Plaintiff on Active Duty for the Purpose of Medical Hold.**

Plaintiff argues that DoDI 1241.01 required that he be continued on active duty for Medical Hold until his injury resolved or a fitness determination was made, regardless of the Secretary's discretionary sanctuary waiver authority.  ECF No. 48 at 30–34.  Defendant contends that the BCNR correctly concluded that the regulation requires the USMC to issue Medical Hold orders only when a reservist consents to receiving them, and Plaintiff did not consent to further orders for Medical Hold when he refused to execute a sanctuary waiver.  ECF No. 45 at 29–30; *see* AR 9–10.  Defendant further argues that the BCNR correctly found no error in the practice of conditioning orders for Medical Hold on sanctuary waivers and that the USMC was required to do so by its own policy.  ECF No. 45 at 29–30; *see* AR 10–11.

This Court previously reached the same conclusion in *Faerber*, in an opinion issued after the BCNR's decision here.  In *Faerber*, the USMC conditioned the further extension of a reservist's active duty orders for Medical Hold on his execution of a sanctuary waiver, and the plaintiff argued that such condition was unlawful given the mandatory obligation stated in DoDI 1241.01.  156 Fed. Cl. at 720–23, 728–29.  As here, the plaintiff in *Faerber* contended that he consented to Medical Hold orders by expressing his desire to remain on active duty for treatment and evaluation, and the USMC was thus required to issue the orders regardless of whether he complied with the USMC's sanctuary waiver condition.  *Id.*; ECF No. 48 at 31.

The Court rejected the argument, concluding that a reservist's *desire* to remain on active duty is not equivalent to *consent* to remain on active duty.  *Faerber*, 156 Fed. Cl. at 729.  Rather, the plain meaning of the term "consent"—which is used consistently in regard to various types of active duty orders for reservists—requires that the reservist agree to the terms of the orders offered.  *Id.*  In the context of the regulatory framework of Medical Hold, that means the USMC must

25

"extend an offer to place or retain an eligible injured reservist on active duty for purposes of medical treatment and disability evaluation.  It is then the reservist's choice to accept the offer (*i.e.*, consent) or refuse the offer."  *Id.* at 730.  Because the plaintiff in *Faerber* refused to execute a sanctuary waiver, as was required to receive further orders for Medical Hold, the Court concluded that the plaintiff did not "consent" to remain on active duty and the USMC could withhold the orders so long as the sanctuary waiver condition was lawful.  *Id.* at 731.  The facts here are analogous.

Plaintiff argues that the Court's holding in *Faerber* was erroneous because it failed to consider 10 U.S.C. § 1074.  ECF No. 48 at 40.  That statute provides that a servicemember on active duty "is entitled to medical and dental care in any facility of any uniformed service."  10 U.S.C. § 1074(a)(1).  Plaintiff characterizes this as an absolute, unqualified entitlement, which the Secretary of Defense extended through DoDI 1241.01 to injured reservists whose active duty orders are set to expire.  ECF No. 48 at 35.  Plaintiff contends that the Court's construction of the consent requirement of DoDI 1241.01 and the sanctuary waiver authority under § 12686(b) is impermissible because, by allowing the USMC to avoid keeping injured reservists on active duty for Medical Hold, it qualifies § 1074's otherwise unqualified entitlement to medical care.  *Id.* at 36–37.

As Plaintiff correctly notes, the arguments before the Court in *Faerber* did not rely significantly (or at all) on § 1074.  Nonetheless, the Court's holding in *Faerber* is not inconsistent with that statutory provision.  Section 1074 applies, as relevant here, only to a servicemember who is "on active duty."  10 U.S.C. § 1074(a)(2)(A).  Once a servicemember is separated from active duty, § 1074's guarantee to medical and dental care in a military facility no longer attaches.  Although Plaintiff satisfied the conditions of § 1074 and had an unqualified entitlement to medical

care during the period of his active duty orders, *see* ECF No. 48 at 35, by its plain language § 1074 did not entitle him to be retained on active duty after his orders expired. Because § 12686 and § 1074 address two separate issues—the former addressing when a reservist in the sanctuary zone may be released from active duty and when the Secretary may require a sanctuary waiver, the latter addressing when a servicemember is entitled to medical care in a military facility—the Court's interpretation of DoDI 1241.01 and § 12686(b) in no way contradicts or circumvents the entitlement afforded by § 1074.

Rather, the Court found that 10 U.S.C. § 12301(h) provides the authority to issue reservists active duty orders to receive medical treatment or disability evaluation. 156 Fed. Cl. at 729 & n.6. That conclusion is consistent with the applicable military regulations. Indeed, DoDI 1241.01 expressly cites § 12301(h) as the authority for ordering Reserve Component members to, or continuing them on, active duty for medical treatment. *See* DoDI 1241.01, encl. 3, ¶ 5; *see also* SECNAVINST 1770.3D, ¶ 8.d (tasking the BIA with the responsibility of authorizing reservists to be recalled or extended on active duty orders for Medical Hold per § 12301(h)); OPNAVINST 1001.27, ¶ 8.g (stating that, in the context of reservists "placed on further active-duty orders for medical hold," the Navy does not intend reservists to attain regular retirement through § 12301(h) orders). Like the plaintiff in *Faerber*, Plaintiff's active duty orders for Medical Hold were issued under § 12301(d), not § 12301(h), due to "fiscal and Reserve manpower policy considerations." AR 885 n.1. Plaintiff argues that there is a clear distinction between the two types of orders because the Secretary may issue a § 12301(h) order only if authorized by the Secretary of Defense. ECF No. 48 at 39. But that authorization is specifically provided in DoDI 1241.01, as well as prior DoDI guidance. *See* SECNAVINST 1770.3, ¶ 3 (referencing DoDI 1241.1 (Feb. 28, 2004) and DoDI 1241.2 (May 30, 2001)). Regardless, orders issued pursuant to §§ 12301(d) or (h) are both

subject to the reservist giving his or her consent and are both subject to the sanctuary waiver authority provided in § 12686(b) because a reservist may reach the sanctuary zone when serving under either type of order.  *Faerber*, 156 Fed. Cl. at 729, 731.

Contrary to Plaintiff's argument, construing the consent requirement in DoDI 1241.01 consistent with the use of the same term in §§ 12301(d) and (h) gives effect to both the regulation's mandatory language and the discretionary authority provided in the statutory sanctuary waiver provision.  Conversely, Plaintiff's reading negates § 12686(b) altogether with respect to active duty orders for Medical Hold, even though it is undisputed that a reservist may attain sanctuary pursuant to § 12686(a) when on such orders.  It does so by reading the mandatory language of DoDI 1241.01 as impliedly constraining the Secretary's discretion to require a sanctuary waiver. ECF No. 48 at 32 ("[T]he Court must presume that the Secretary of Defense . . . was intentional in his choice of language, and cognizant of [the] implications of that choice . . . .").  Although that mandatory language "requires that [the Secretary] extend an offer to place or retain an eligible injured reservist on active duty for purposes of medical treatment and disability evaluation," *Faerber*, 156 Fed. Cl. at 730, nothing in DoDI 1241.01 addresses (explicitly or implicitly) the Secretary's congressionally-delegated, discretionary waiver authority.[6]  Far from imposing an either-or reading (ECF No. 48 at 37), the Court chooses, as it must, the most harmonious

---

[6] To put a finer point on it, the Secretary has to make *two* decisions in the case of an eligible injured reservist who is at or beyond 18 years of active duty service, one of which is affected by DoDI 1241.01 and one of which is not.  First, under § 12301, will the Secretary order the reservist to, or retain him on, active duty for Medical Hold?  With respect to § 12301(h), the Secretary's discretion is dependent on the Secretary of Defense's authorization.  DoDI 1241.01 not only authorizes an active duty order for medical treatment or disability evaluation, but it also directs the Secretary to issue the order so long as the reservist meets the criteria (including consent).  Next, under § 12686(b), will the Secretary require as a condition of the order that the reservist waive sanctuary?  DoDI 1241.01 is silent on that issue, and the parties have cited no DoD-level guidance that otherwise addresses sanctuary waivers.

interpretation. *See BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1273 (Fed. Cir. 2002); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[S]o long as there is no 'positive repugnancy' between two laws, a court must give effect to both" such that the interpretation "would not render one or the other wholly superfluous." (quoting *Wood v. United States*, 41 U.S. 342, 363 (1842))).

Accordingly, there is no reason for the Court to stray from its conclusion in *Faerber*, as the Court's holding applies with equal force to Plaintiff here. "Because Plaintiff refused to waive his sanctuary protections, and therefore did not yield to the terms of the USMC's offer to extend his orders, he did not consent (according to the plain meaning of that term) to remaining on active duty." *Faerber*, 156 Fed. Cl. at 731. Absent his consent, "the USMC had no obligation to extend Plaintiff's active duty orders to facilitate his Medical Hold." *Id.*

### B.   The BCNR Erred in Finding that the USMC Lawfully Conditioned Plaintiff's Active Duty Orders for Medical Hold on the Execution of a Sanctuary Waiver.

As in *Faerber*, the next step in the analysis is to determine whether the USMC could lawfully apply the waiver requirement to Plaintiff. *Id.* Plaintiff argues that the Secretary's authority under § 12686(b) extends only to the first set of orders to active duty for 179 days or less. ECF No. 48 at 44–45. While each of Plaintiff's orders individually covered a period of less than 180 days, they collectively amounted to greater than 179 days of continuous active duty service. Defendant argues, just as the BCNR concluded, that the USMC lawfully required a waiver as a condition of Plaintiff's active duty orders, regardless of their collective length, because (unlike in *Faerber*) each order specified a period of less than 180 days. ECF No. 45 at 32 (citing AR 12). Both parties argue that their interpretations are consistent with the plain language of § 12686(b). *See* ECF No. 48 at 45; ECF No. 51 at 21–22.

The Court's analysis in *Faerber* is again instructive.  In that case, the USMC issued the plaintiff an initial 183-day active duty order and several consecutive modifications (*i.e.*, extensions) of the original order without requiring the execution of a sanctuary waiver.  *Faerber*, 156 Fed. Cl. at 721–22.  While each modification standing alone extended the plaintiff's orders for a period of less than 180 days, "[e]ach modification increased Plaintiff's days of active duty, *i.e.*, 490 days, 517 days, and ultimately 538 days."  *Id.* at 722.  Evidence in the record demonstrated that the USMC planned to keep the plaintiff on active duty for Medical Hold through a similar extension of his orders; however, HQMC required a sanctuary waiver for this final extension.  *Id.* at 732.

Based on the plain language of § 12686(b), the Court concluded that the USMC was not authorized to condition the modification of the plaintiff's orders on the execution of a sanctuary waiver for two reasons.  *Id.* at 733–36.  First, the Court noted that § 12686(b) only applied to orders "to active duty."  *Id.* at 734.  The modification the USMC offered, however, did not order the plaintiff *to* active duty, but rather *retained* him on active duty through an extension of his initial order.  *Id.*  Second, the Court held that the USMC's interpretation of its waiver authority as applying to incremental extensions of orders covering active duty periods beyond 180 days was "unreasonable because it would render the waiver provision's temporal limitation superfluous."  *Id.* at 735.  The Court noted that § 12686(b) contemplated only a short-term order to active duty for a period of less than 180 days.  *Id.*  If each modification was treated as an isolated active duty period, the Court concluded, then "[t]he statute's temporal restriction is effectively meaningless."  *Id.* (holding that such interpretation would undermine the sanctuary protection Congress conferred on reservists and expand the flexibility afforded to the Secretary through the waiver provision).

*Faerber* does not support Defendant's interpretation here.  Under the surplusage cannon, "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)).  If the Secretary was permitted, as Defendant suggests, to condition multiple back-to-back orders to active duty that individually covered 179 days or less but collectively amounted to 180 days or more on the execution of sanctuary waivers, the Secretary could require a reservist to waive sanctuary for an indeterminate continuous amount of time—including the entire sanctuary period.  Just as in *Faerber*, Defendant's interpretation renders § 12868(b)'s 179-day temporal limitation superfluous.  *See Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1654 (2017) ("[E]ach word Congress uses is there for a reason.").  Under Defendant's reading, the temporal language is no limitation at all or is, at best, hollow because it can be easily circumvented by changing the form of the order issued.  Indeed, that is the only material difference between the facts of *Faerber* and this case.  Whether it was by way of extensions or back-to-back orders, both plaintiffs were on active duty consecutively for hundreds of days when the USMC conditioned further orders on the execution of a waiver.  Because Defendant's interpretation would render the temporal language "superfluous, void, or insignificant,'" *TRW*, 534 U.S. at 31 (quoting *Duncan*, 533 U.S. at 174), it is untenable.

Defendant's arguments to the contrary are unpersuasive.  At oral argument, it contended that its interpretation gives effect to the waiver provision's temporal language because it requires

the USMC every 179 days to decide whether to continue a sanctuary-eligible reservist on active duty. It is not clear, however, what end that serves vis-à-vis sanctuary. The same decision point accompanies the expiration of any reservist's orders, regardless of the length of the order or the reservist's total prior active duty time. And here, the USMC has already decided per the policy stated in MCO 1800.11, ¶ 4.k.1 that any active duty order allowing a reservist to accumulate more than 18 years of active duty "shall not be issued to [the reservist] without a sanctuary request approved in accordance with this order." Accepting Defendant's interpretation, such a decision appears merely perfunctory and does little (if anything) to give meaning to the temporal limitation. Indeed, for his final sets of orders, HQMC issued Plaintiff both a short extension of his then-current orders to take him to 179 days and a back-to-back order for a follow-on period of 103 days of active duty *on the same day*, a procedure not materially different from issuing a single order extending the active duty period to more than 180 consecutive days. AR 24, 1276.

Defendant also emphasizes that § 12686(b) places no explicit limit on the number of active duty orders the Secretary may condition on the execution of a sanctuary waiver so long as each order specifies a period of under 180 days. ECF No. 51 at 20–21. The Court agrees. Although not an issue that is raised by the facts of this case, the waiver provision does not expressly prohibit the Secretary from ordering a sanctuary-eligible reservist to multiple, separate short-term periods of active duty under § 12301. What it does limit, however, is the duration of each period. In that vein, the provision speaks to a single "order to active duty that specifies a period of less than 180 days." 10 U.S.C. § 12686(b). That plainly excludes from the Secretary's waiver authority an active duty order (or modified order) that states a period of 538 days, as in *Faerber*. And, to give any meaning to the temporal language (as well as the sanctuary protection afforded in subsection

(a)), it must also exclude a string of active duty orders that collectively creates a long-term active duty period, 179 days at a time.[7]

As in *Faerber*, the Court acknowledges the "substantial deference" owed to the military in the governance of its own affairs. *Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013) (quoting *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993)); *see Voge*, 844 F.2d at 779. That deference, however, is not without limits, and "[a]ny and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress." *Killip v. Off. of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993). Indeed, "the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent." *Brookins v. United States*, 75 Fed. Cl. 133, 146 (2007). Because the plain language of § 12686(b) provides a "clear answer" regarding Congress's intent to temporally limit the Secretary's authority, the Court will not defer to Defendant's interpretation of that statute, including in MCO 1001.61A. *Id.* at 141.

---

[7] Although review of the legislative history is not necessary to the Court's interpretative task, it likewise supports this reading. The waiver provision appears to have originated from a recommendation by the Reserve Officers Association, which was concerned that reservists in or near sanctuary were not being used "for short periods of active duty" due to the limitation on release provided in § 12686(a). *DoD Authorization for Appropriations for Fiscal Year 1997 and the Future Years Defense Program: Hearings Before the S. Comm. on Armed Servs.*, 104th Cong. 277 (1996) (statement of Maj. Gen. Roger W. Sandler, Reserve Officers Association). It recommended that reservists on active duty (other than for training) be required to serve "for a period of 180 consecutive days or longer in order to request active duty retirement sanctuary." *Id.* Both the original and amended versions of the waiver provision proposed by the Senate and House, respectively, included the same 179-day temporal limitation as the enacted version. S. 1745, 104th Cong. § 514 (1996); H.R. 3230 § 533 (1996). The Senate, which originally proposed the provision, described the waiver provision's purpose as permitting eligible reservists "to serve on active duty for a period of less than 180 days, if he or she waives the retirement sanctuary." S. Rep. No. 104-267, at 285 (1996). Just as the statutory text refers to a singular order to active duty, the congressional materials refer to a singular period of active duty. If Congress's intent was to authorize reservists to execute multiple, consecutive waivers covering continuous active duty service for up to the length of the entire sanctuary period, it is not reflected in the legislative history.

There is no dispute that had the USMC issued Plaintiff further active duty orders beyond March 2016, it would have caused Plaintiff to serve over 180 days of active duty service and enter the sanctuary zone.  AR 908 (quoting email indicating that Plaintiff would receive further active duty orders with an end date of June 24, 2016, to coincide with initial Medical Hold authorization); AR 1343 (Plaintiff's DD-214 reflecting five months and 17 days of "net active service this period" and 17 years, 11 months, and one day of "total prior service" as of March 23, 2016).  It is also undisputed that, as of his separation in March 2017, Plaintiff had been on continuous active duty for 282 days in the sanctuary zone.  AR 1344 (Plaintiff's DD-214 reflecting nine months and nine days of "net active service this period" and 18 years, four months, and 16 days of "total prior active duty service" as of March 22, 2017); *see* ECF No. 51 at 23 (agreeing that Plaintiff was on continuous active duty service because "there was less than a 31-day break between two separate active duty orders").  The USMC therefore acted unlawfully under § 12686(b) when it conditioned further active duty orders for Medical Hold in March 2016 and March 2017 on the execution of a sanctuary waiver.

As evident from communications between Plaintiff and various USMC officials, Plaintiff desired to remain on active duty through the Medical Hold process past March 23, 2016, and again past March 22, 2017; the only reason he did not receive further active duty orders at each of those times was because he refused to execute an additional sanctuary waiver, believing it was unlawful for the USMC to require him to do so.  AR 392–93, 571, 908–09, 1106, 1230–33, 1270, 1293–94, 1314.  Communications between Plaintiff and the USMC further reveal that the USMC provided Plaintiff with no other alternative than executing a sanctuary waiver to continue on Medical Hold. AR 392–93, 1240–41, 1233–36, 1270, 1314–15.  Accordingly, the record demonstrates that but for the USMC unlawfully conditioning Plaintiff's orders on the execution of a sanctuary waiver,

he would have continued on active duty beyond March 23, 2016, and again beyond March 22, 2017. It is undisputed that had the USMC issued further orders beyond those dates without an approved sanctuary waiver, Plaintiff would have attained sanctuary status. AR 1343–44. Under such conditions, Plaintiff is entitled to relief for his involuntary separation. *See Faerber*, 156 Fed. Cl. at 737.

### C.    Plaintiff Fails to Meet His Burden on the Remainder of His Claims.

That the USMC unlawfully exercised its authority to require a waiver of sanctuary is sufficient to grant judgment in Plaintiff's favor. To the extent it assists any review of this order, the Court will nonetheless address Plaintiff's other claims, each of which fails.

### 1.    The Secretary Delegated Authority to HQMC to Condition Active Duty Orders on the Execution of a Sanctuary Waiver.

The parties agree that under § 12686(b), Congress empowered the Secretary to condition active duty orders on the execution of a sanctuary waiver. However, it was HQMC, not the Secretary, that imposed the requirement on Plaintiff. Plaintiff argues that his sanctuary waivers were invalid because the Secretary has not delegated waiver authority to HQMC. ECF No. 48 at 22–24. The BCNR concluded, and Defendant now argues, that the Secretary properly delegated such authority through SECNAVINST 1800.2. ECF No. 45 at 30; AR 11.

SECNAVINST 1800.2 provides,

> OPNAV (N13) and CMC (M&RA) may authorize Reserve personnel who possess unique or critical skills to exceed 18 years of active duty service to meet mission requirements. Reference (c) details the process for Navy Reserve personnel. The Marine Corps process, sanctuary considerations and manpower assignments are provided under CMC (M&RA) instruction.

*Id.* ¶ 3.d.[8]

---

[8] "OPNAV (N13)" stands for the Assistant Chief of Naval Personnel for Military Personnel Policy and Career Progression. SECNAVINST 1800.2, ¶ 3.a. "CMC (M&RA)" stands for the

The BCNR correctly concluded that under this provision the Secretary delegated waiver authority to HQMC, specifically the CMC (M&RA).  The naval instruction explicitly grants HQMC the authority to "authorize Reserve personnel . . . to exceed 18 years of active duty . . . to meet mission requirements."  *Id.*  Implicit in the authority to authorize such reservists to active duty is the authority to create the standards and conditions for issuing their active duty orders.  *See Starr Int'l Co., Inc. v. United States*, 121 Fed. Cl. 428, 434 (2015), *aff'd in part*, *vacated in part*, 856 F.3d 953 (Fed. Cir. 2017) ("[A]uthority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized." (quoting *Fed. Rsrv. Bank of Richmond v. Malloy*, 264 U.S. 160, 167 (1924))).  Without the ability to determine the conditions of those orders, the CMC (M&RA)'s explicit authority would be rendered meaningless, or at least significantly undercut.

Further evidencing the Secretary's delegation is the naval instruction's explicit affirmation of Marine Corps instructions addressing "sanctuary considerations."  SECNAVINST 1800.2, ¶ 3.d.  One important "sanctuary consideration" is, of course, whether a reservist must execute a sanctuary waiver to receive active duty orders.  Indeed, as discussed above, multiple Marine Corps Orders address sanctuary waiver requirements and direct the CMC M&RA to withhold an order until a reservist has signed a waiver.  *See* MCO 1800.11, ch. 2, ¶ 4.f; MCO 1001.61A, ch. 3, ¶ 7. Specifically acknowledging the Marine Corps' own instructions is strong evidence that the Secretary approved of HQMC taking actions in conformance with those orders.

Plaintiff argues that where the Secretary has delegated other authority in naval instructions it was done more explicitly and that those instructions juxtaposed against SECNAVINST 1800.2,

---

Commandant of the Marine Corps Manpower and Reserve Affairs, *id.*, and is synonymous with "DC (M&RA)," AR 11 n.17.

¶ 3.d reveal that the latter is not a proper delegation of authority.  ECF No. 48 at 23–24.  First, Plaintiff points to SECNAVINST 1770.3D, through which Plaintiff claims the Secretary expressly delegated benefits issuing authority to HQMC.  *Id.*  That provision states, "The DCMC (M&RA) has management and oversight authority for all Marine Corps Reservists in the MedHold and LOD Determination Programs," and then outlines other specific duties of HQMC.  SECNAVINST 1770.3D, ¶¶ 7.d, 9.  Contrary to Plaintiff's assertion, this provision's delegation of authority is no more explicit than SECNAVINST 1800.2.  Just as SECNAVINST 1800.2 delegates implied authorities necessary to effectuate the CMC (M&RA)'s express authority to permit "reserve personnel . . . to exceed 18 years of active duty service," SECNAVINST 1770.3D delegates implied authorities necessary to effectuate the broad grant of "management and oversight authority" over the processes for Medical Hold and LOD determinations.

Plaintiff also points to an amended version of SECNAVINST 1800.2 that took effect after the USMC issued Plaintiff's active duty orders.  That instruction states,

> OPNAV (N13) and DC M&RA may require any RC member to waive the applicability of the sanctuary provision in section 12686 of [Title 10] as a condition of issuing active-duty orders (other than for training) pursuant to section 12301 of [Title 10] for a period of less than 180 days.  This provision shall not render invalid any sanctuary waiver effected prior to this issuance, or any Navy or Marine Corps policy regarding sanctuary (unless in contravention of this issuance).

SECNAVINST 1800.2A, ¶ 6.b (Mar. 28, 2019).  To be sure, this naval instruction more explicitly delegates waiver authority to the CMC (M&RA) than its predecessor.  However, the amendment merely clarifies authority already delegated to the USMC rather than grant new authority.  *See, e.g.*, *Shell Oil Co. v. United States*, 688 F.3d 1376, 1385 n.6 (Fed. Cir. 2012) (holding regulatory amendment clarified existing requirements rather than creating new ones); *Cole Cnty. Reg'l Sewer Dist. v. United States*, 22 Cl. Ct. 551, 558, *aff'd*, 949 F.2d 404 (Fed. Cir. 1991) (same).  The amended instruction makes this clear by providing that "[t]his provision shall not render invalid

any sanctuary waiver effected prior to this issuance, or any Navy or Marine Corps policy regarding sanctuary."  SECNAVINST 1800.2A, ¶ 6.b.

Accordingly, Plaintiff's sanctuary waivers are not void *ab initio* due to a lack of delegated authority.

### 2.   The BCNR Rationally Concluded that HQMC Approved Plaintiff's Requests for Sanctuary Waivers.

Plaintiff also contends that HQMC never approved his requests for sanctuary waivers because it failed to comply with certain Marine Corps Orders setting forth the approval and notification procedures, and thus the purported waivers are invalid.  ECF No. 48 at 24–28.  The BCNR concluded that the circumstances surrounding the issuance of Plaintiff's orders implied that HQMC approved his sanctuary waiver requests.  AR 12–13.  Specifically, each order was issued only after Plaintiff was notified of the waiver requirement and submitted a waiver request.  AR 13. Defendant contends that the BCNR's factual determination was rational and supported by the record, and the BCNR correctly concluded that any failure to comply with the process and procedures does not create a cause of action for reservists.  ECF No. 45 at 34–36.

Reservists seeking to exceed 18 years of active duty service in the USMC are required to submit a *request* for a sanctuary waiver.  MCO 1800.11, ch. 2, ¶¶ 3.c–d, 4.a.  The documents Plaintiff submitted to receive a sanctuary waiver were thus written in the form of a request.  AR 1243 (sanctuary waiver form stating it is valid only "[i]f approved"); AR 1248 (sanctuary waiver form stating it is not effective "until this waiver is acknowledged"); *see also* MCO 1800.11, ch. 2, p. 2–9 (same).  Defendant agrees that requests for sanctuary waiver are not self-executing.  ECF No. 51 at 24.  Once a reservist submits a request, HQMC must then make a "decision" on whether to approve the request.  MCO 1800.11, ch. 2, ¶ 4.d.  Once HQMC has decided to approve a sanctuary waiver request, it must notify the reservist via naval message.  *Id.*  It also must include

specific language in the reservist's active duty orders recognizing that the reservist has waived sanctuary protection.  *Id.* ¶ 4.e.

There is no evidence in the Administrative Record that HQMC notified Plaintiff that his requests for sanctuary waiver had been approved, and Plaintiff's active duty orders are devoid of the sanctuary waiver language mandated by MCO 1800.11.  AR 1074–80, 1255–60, 1276–82.  In fact, two of Plaintiff's orders expressly state that Plaintiff "may become eligible for sanctuary zone protection under Title 10, United States Code, Section 12686(A)."  AR 1080, 1260.

Plaintiff argues that these procedural steps are necessary for a sanctuary waiver request to be approved.  ECF No. 48 at 27.  MCO 1800.11 states, however, that these actions are required only "[u]pon decision."  MCO 1800.11, ch. 2, ¶ 4.d.  Accordingly, these actions are required *after* HQMC has already approved a sanctuary waiver request.  Although HQMC failed to abide by its own procedures by not notifying Plaintiff that his sanctuary waiver requests were approved and not including the sanctuary waiver language in his active duty orders, such failures are not dispositive proof that HQMC *did not* approve Plaintiff's requests.  Still, the facts are relevant and constitute circumstantial evidence.  The BCNR simply found other circumstantial evidence more persuasive.

"This court's review [of a BCNR decision] 'does not require a reweighing of the evidence, but [rather] a determination whether the *conclusion being reviewed* is supported by substantial evidence.'"  *Stein v. United States*, 121 Fed. Cl. 248, 267 (2015) (emphasis in original) (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)).  "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Jennings v. Merit Sys. Prot. Bd.*, 59 F.3d 159, 160 (Fed. Cir. 1995) (citing *Hathaway v. Merit Sys. Prot. Bd.*, 981 F.2d 1237, 1240 (Fed. Cir. 1992)).

Here, the undisputed facts are that HQMC notified Plaintiff that it would not issue further active duty orders without sanctuary waivers, Plaintiff submitted the waivers, and his orders followed—notwithstanding that Plaintiff was not notified of the waiver approval and that his orders contained boilerplate sanctuary language.   It is not unreasonable to conclude, as the BCNR did, that HQMC approved the requests (albeit without following all the post-approval procedural requirements), otherwise it would not have issued Plaintiff active duty orders.   Indeed, the BCNR and Defendant are correct that it would be irrational for HQMC to require Plaintiff to submit sanctuary waiver requests as a condition of his orders, then not approve them and issue the orders anyway.   While it is also possible that HQMC issued the orders without approving Plaintiff's requests due to administrative oversight, that possibility does not render the BCNR's alternative conclusion unreasonable nor will the Court engage in a reweighing of the facts.

Plaintiff contends that, under the "presumption of regularity," the Court is required to presume that HQMC lawfully and in good faith decided not to approve Plaintiff's sanctuary waiver requests and ordered him to active duty as sanctuary eligible.   ECF No. 48 at 26.   "The 'presumption of regularity' supports official acts of public officers.   In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties." *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)); *see In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir. 1988)).   "The doctrine thus allows courts to presume that what appears regular is regular, the burden shifting to the attacker to show the contrary." *Id.*   (citing *United States v. Roses, Inc.*, 706 F.2d 1563, 1567 (Fed. Cir. 1983)).   Courts have found it appropriate to apply the presumption "where a government official or entity conducts official acts in the manner provided

by statute, regulation, or policy." *James Madison Project v. Dep't of Just.*, 302 F. Supp. 3d 12, 32 (D.D.C. 2018).

Under either party's theory, however, HQMC did not act in a manner provided by Marine Corps Orders.  Issuing a reservist orders without approving his or her waiver request would violate MCO 1800.11.  *See* MCO 1800.11, ch. 2, ¶¶ 3.a, 3.c.  By the same token, approving a reservist's sanctuary waiver requests without following the post-approval procedures of MCO 1800.11 also would be a violation.  *See id.* ch. 2, ¶¶ 4.d–f.  In short, the presumption does not apply here, and the Court is left to review the BCNR's factual determination.

Because the BCNR's determination was rational and based on substantial evidence, the Court will not disturb the BCNR's conclusion and need not address whether MCO 1800.11 creates a cause of action.

3.   That the USMC Separated Plaintiff in March 2017 Without a Separation Physical Examination and Pre-Separation Counseling Was Harmless.

As an alternative ground, Plaintiff argues that he was unlawfully separated from active duty in March 2017 because he was not afforded a separation physical examination and pre-separation counseling.  ECF No. 48 at 50–54.  The BCNR agreed but found the violation was harmless because, unlike in 2012, had the USMC followed the mandatory procedures Plaintiff would have separated just the same due to his decision not to sign a sanctuary waiver.  AR 13.  In their cross-motions, the parties dispute whether Plaintiff has demonstrated prejudice sufficient to warrant relief in this matter.  ECF No. 48 at 52–53; ECF No. 51 at 26–27.  On this point, Defendant has the better position.

In his motion, Plaintiff identifies three harms that he alleges resulted from not receiving a physical examination and counseling: (1) deprivation of medical information necessary to determine his veterans' benefits, (2) ineligibility to join a reserve unit in the absence of a fit for

duty determination, and (3) ineligibility for further active duty orders in the absence of a fit for duty determination.  ECF No. 48 at 52.  Each of these harms is unrelated to the claim at bar, which seeks back pay for Plaintiff's wrongful separation.  Plaintiff fails to show that allegations of collateral harm are sufficient or even relevant under the harmless error analysis.  Indeed, in a military pay case seeking back pay for wrongful separation, the Federal Circuit described the burden of a plaintiff as requiring "a showing that the [challenged] defect substantially affected the decision to separate him or relieve him from active duty."  *Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003).  Plaintiff does not allege, nor would it be reasonable to infer, that he would have remained on active duty had he received the required examination and counseling.  The catalyst for his separation was the USMC's conditioning of further orders on the execution of a sanctuary waiver and his decision to refuse.

Moreover, as Defendant correctly argues, the alleged harms appear largely hypothetical in nature.  *See* ECF No. 51 at 26–27.  Plaintiff did not allege, either before the BCNR or in this action, that he was actually denied some or all veterans' benefits to which he was entitled due to a lack of medical documentation.  Nor did Plaintiff allege that he was in fact fit for duty when he separated in March 2017 but was denied reserve drill or active duty assignments due to a lack of a fitness decision.  In any event, neither a claim for veterans' benefits nor a claim for wrongful denial of reserve drill time would entitle him to relief in this Court.  *See Sindram v. United States*, 103 F. App'x 456, 458 (Fed. Cir. 2005); *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999).  It is likewise unclear how Plaintiff would have been prejudiced in the manner alleged where alternative benefit programs were available to him, such as the Department of Veterans Affairs, which is authorized to conduct medical examinations, 38 C.F.R. § 3.326(a)), or the Line of Duty benefit program to which he was authorized to transfer.

Accordingly, the BCNR did not act arbitrarily and capriciously, or contrary to law, in finding the USMC's violation of law harmless.

## CONCLUSION

For the above stated reasons, Defendant's Motion for Judgment on the Administrative Record (ECF No. 45) is hereby **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Cross-Motion for Judgment on the Administrative Record (ECF No. 48) is **GRANTED IN PART** and **DENIED IN PART**.  On or before March 15, 2023, the parties shall file a joint status report proposing appropriate next steps consistent with this Opinion, including remedies, and a schedule for post-judgment proceedings should they be necessary.

**SO ORDERED**.


Dated: March 1, 2023                          _____*/s/ Kathryn C. Davis*_____
                                                        KATHRYN C. DAVIS
                                                        Judge